## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-02057-RM-STV

JOEL W. MATZDORF,
MIKAYLA MATZDORF,
DUANGDOW C. HOYORD,
LUKE T. HOYORD, *individually and on behalf of all others similarly situated*,

Plaintiffs,

v.

UPONOR, INC.,
UPONOR NORTH AMERICA, INC.,

Defendants.
_____

### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

Magistrate Judge Scott T. Varholak

This matter comes before the Court on Defendants Uponor, Inc. and Uponor North America, Inc.'s Motion to Dismiss Plaintiffs' Amended Complaint and Class Allegations, or, in the Alternative, to Compel Arbitration and Strike Class Allegations ("the Motion"). [#33] The Motion has been referred to this Court. [#34] The Court has carefully considered the Motion and related briefing, the entire case file, and the applicable case law, and has determined that oral argument would not materially assist in the disposition of the Motion. For the following reasons, this Court respectfully **RECOMMENDS** that the Motion be **DENIED.**

I.     **BACKGROUND**[1]

This class action relates to red and blue colored cross-linked polyethylene tubing ("PEX") manufactured and distributed by Defendants Uponor, Inc. and Uponor North America, Inc., which Plaintiffs allege suffers from design and manufacturing defects. [#31 at ¶ 1]  In 2017, Plaintiffs Joel W. Matzdorf and Mikayla Matzdorf (collectively the "Matzdorf Plaintiffs") purchased a home in Erie, Colorado from Oakwood Homes LLC. [*Id*. at ¶¶ 2, 9]  Also in 2017, Plaintiffs Duangdow C. Hoyord and Luke T. Hoyord (collectively the "Hoyord Plaintiffs") purchased a home in Frederick, Colorado built by Saint Aubyn Homes, LLC.  [*Id*. at ¶¶ 3, 10]  Both homes were originally constructed with Uponor PEX in the potable water plumbing system.  [*Id*. at ¶¶ 9-10]  Today, "[t]he Uponor PEX in Plaintiffs' Homes is prematurely degrading, deteriorating and/or failing and suffers from micro-cracking."  [*Id*. at ¶ 11]

As of 2016, Defendants produced over five billion feet of Uponor PEX, were responsible for approximately one-third of all PEX sold in the United States, and did business with all of the top ten homebuilders in the United States.  [*Id*. at ¶¶ 18-19] Defendants "designed, manufactured, advertised/marketed, distributed, and/or sold UPONOR PEX for use in potable water plumbing systems throughout the United States," and represented that their product was high quality.  [*Id*. at ¶¶ 22-24] Moreover, Defendants represented that their PEX has "superior resistance to stress-crack corrosion and will suffer no micro-cracking during expansion."  [*Id*. at ¶ 25 (quotation omitted)]

---

[1] The facts are drawn from the allegations in Plaintiffs' Amended Complaint [#31], which must be taken as true when considering a Motion to Dismiss. *See Wilson v. Montano*, 715 F.3d 847, 850 n.1 (10th Cir. 2013) (citing *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011)).

According to the Amended Complaint, in creating the red and blue PEX for potable water lines, most PEX manufacturers add the red or blue color pigment and accompanying stabilizers to the plastic formulation when the tubing is formed—called the extrusion process—and prior to cross-linking.  [*Id*. at ¶ 13]  This adds color evenly throughout the tubing wall.  [*Id*.]  Unlike the majority of manufacturers, however, Defendants add a red or blue coating to the tubing's outside surface *after* the extrusion process.  [*Id*. at ¶ 15]  Because coating does not stick to PEX, Defendants patented a process to color coat their PEX tubing, which involves:

> [C]onveying the PEX tubing "through an oxidizing step in which at least the outer surface of the base pipe is oxidized, through a coating step in which a pre-polymer system is applied to the outer surface of the base pipe and through a curing step in which the pre-polymer is cured to form a layer of the pipe."

[*Id*. (quoting Uponor Innovation AB, Fristad (SE), Appl. No. 12/572,683, Filed Oct. 2, 2009)]

In other words, Defendants "run the tubing through a furnace/flame treatment that oxidizes/burns the outside of the pipe."  [*Id*. at ¶ 16]  This oxidation process "destroys the antioxidants from the outside of the UPONOR PEX tubing, subjecting the tube to actual damage and premature failure in the form of, among other things, oxidative degradation, micro cracking, cracking, through-wall cracking, leaks and other property damage."  [*Id*.]  Specifically, the treatment causes the outside surface to "prematurely become[] brittle and develop[] microcracks when the tubing is expanded during installation," and those cracks continue to grow and spread over time.  [*Id*. at ¶ 17]  "Beginning in or around 2021, Defendants discontinued their manufacture, distribution and sale of red and blue UPONOR PEX because of the defects with the product."  [*Id*. at ¶ 32]  "However, Defendants misrepresented that the product was

being 'suspended,' not 'discontinued,' and instead concealed that it discontinued the product due to the defects and premature failures and damages." [*Id*.]

Plaintiffs allege that the Uponor PEX suffers from design and manufacturing defects and, as a result, is "predisposed to premature oxidative failure, micro cracking, through wall cracking, leaks, loss of use, and other failure and damages . . . [which cause the PEX to] fail to perform when put to their intended use, leak and reduce their normal useful life." [*Id*. at ¶ 27]  Plaintiffs further allege that Defendants knew their product suffered defects, failed to take appropriate steps to ensure that their products were safe for intended use, and failed to compensate consumers for damage to property. [*Id*. at ¶¶ 28-30]

Plaintiffs filed the instant class action lawsuit on July 29, 2021, and filed an Amended Complaint on November 10, 2021. [##1, 31]  The Amended Complaint identifies a class of "[a]ll persons or entities who own homes or other structures in Colorado with UPONOR PEX used as the lines and components of a potable water plumbing system." [#31 at ¶ 41]  Plaintiffs assert three claims: (1) strict product liability, (2) breach of the implied warranty of merchantability, and (3) negligence. [*Id*. at ¶¶ 52-97]  Defendants filed the instant Motion on November 17, 2021, seeking, in the alternative, to: (1) dismiss Plaintiffs' claims for lack of standing, (2) compel Plaintiffs to arbitration, or (3) dismiss the claims for failure to state a claim. [*See generally* #33]  A response and reply to the Motion have been filed. [##35, 36]

## II.   LEGAL STANDARDS

### A.  Motions to Dismiss

Federal Rule of Civil Procedure 12(b)(1) empowers a court to dismiss a complaint for "lack of subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case, but only a determination that the court lacks authority to adjudicate the matter.  *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so).  A court lacking jurisdiction "must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking."  *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).

Rule 12(b)(1) challenges are generally presented in one of two forms: "[t]he moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests."  *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir.2004) (quoting *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir.2003)).  When reviewing a facial attack on subject matter jurisdiction, the Court "presume[s] all of the allegations contained in the amended complaint to be true."  *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002).

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  In deciding a motion under Rule 12(b)(6), a court must "accept as true all well-pleaded factual allegations . . .

and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (alteration in original) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). Nonetheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Id.* (quoting *Twombly*, 550 U.S. at 556). The ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

### B. Motions to Compel Arbitration

Arbitration agreements are governed by the Federal Arbitration Act ("FAA"). *See* 9 U.S.C. § 1 *et seq.* But "[t]he existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." *Avedone Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1287 (10th Cir. 1997). "[U]nlike the general presumption that

a particular issue is arbitrable when the existence of an arbitration agreement is not in dispute, when the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away." *Nesbitt v. FCNH, Inc.*, 74 F. Supp. 3d 1366, 1370 (D. Colo. 2014) ("*Nesbitt I*") (quoting *Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 779 (10th Cir. 1998)), *aff'd*, 811 F.3d 371 (10th Cir. 2016) ("*Nesbitt II*"); *see also Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir. 2002) (stating that the "presumption [of arbitrability] disappears when the parties dispute the existence of a valid arbitration agreement"). "A federal court must apply state contract law principles when determining whether an arbitration agreement is valid and enforceable." *Nesbitt I*, 74 F. Supp. 3d at 1371 (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

If the court determines the existence of a valid and enforceable arbitration agreement, the FAA then applies. Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985); *see also Nesbitt I*, 74 F. Supp. 3d at 1370 (same). Accordingly, the FAA requires the Court to "rigorously enforce agreements to arbitrate," *Dean Witter Reynolds*, 470 U.S. at 221, unless the agreement to arbitrate is invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability," *Nesbitt II*, 811 F.3d at 376 (quoting *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339

(2011)); *see also Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1622 (2018).  But an arbitration agreement will not be nullified by "defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue."  *Id.*

In considering a motion to compel arbitration under the FAA, the court applies "a standard similar to that governing motions for summary judgment."  *Stein v. Burt-Kuni One, LLC*, 396 F. Supp. 2d 1211, 1213 (D. Colo. 2005); *see also Ragab v. Howard*, 841 F.3d 1134, 1139 (10th Cir. 2016) ("When parties do not dispute the material facts surrounding an arbitration provision, then a district court, while viewing the facts most favorable to the non-moving party, can decide as a matter of law whether the parties actually agreed to arbitrate," applying a "standard [that] is similar to the summary judgment standard").  Accordingly, a defendant "must present evidence sufficient to demonstrate an enforceable arbitration agreement."  *Stein*, 396 F. Supp. 2d at 1213.  Then, the burden shifts to plaintiffs "to raise a genuine issue of material fact as to the making of the agreement, using evidence comparable to that identified in Fed. R. Civ. P. 56."  *Id.*  If that occurs, "then a trial on the existence of the arbitration agreement is required."  *Id.*

## III.   ANALYSIS

In the Motion, Defendants argue that this Court should: (1) dismiss Plaintiffs' claims for lack of standing, (2) compel Plaintiffs to arbitration, or (3) dismiss the claims for failure to state a claim.  [*See generally* #33]  The Court will address these arguments in turn.

### A.  Standing

The Court first addresses the jurisdictional issue of Article III Standing.  *See, e.g.*, *Wilcosky v. Amazon.com, Inc.*, 517 F. Supp. 3d 751, 761 (N.D. Ill. 2021); *Mejia v. Uber*

8

*Techs., Inc.*, 291 F. Supp. 3d 1314, 1316-1317 (S.D. Fla. 2018) (sua sponte addressing Article III standing before addressing motion to compel arbitration).  "Article III of the Constitution confines the judicial power of federal courts to deciding actual 'Cases' or 'Controversies.'" *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) (quoting U.S. Const. art. III, § 2).  "Plaintiffs must demonstrate a personal stake in the outcome in order to assure that concrete adverseness which sharpens the presentation of issues necessary for the proper resolution of constitutional questions."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (quotations omitted).  "Plaintiffs must show they have sustained or are immediately in danger of sustaining some direct injury, and the injury or threat of injury must be real and immediate, not conjectural or hypothetical."  *Faustin v. City & Cnty. of Denver*, 268 F.3d 942, 947 (10th Cir. 2001).  As a result, "[t]o establish standing, plaintiffs must show injury in fact, a causal relationship between the injury and the challenged action of the defendant, and a likelihood that the injury will be redressed by a favorable decision."  *Id.*

Here, Defendants challenge the injury-in-fact requirement.  [#33 at 6-10] Specifically, Defendants argue that Plaintiffs have failed to "plead any non-conclusory facts establishing they have personally experienced any injury-in-fact" and instead that Plaintiffs "simply assert in a conclusory fashion, and speculate in the broadest terms, that the 'PEX in [their] Homes is prematurely degrading, deteriorating and/or failing and suffers from micro-cracking[,]' without providing any facts substantiating that professed belief or referencing any resulting damage to their homes."  [*Id.* at 8]  Thus, according to Defendants, Plaintiffs have not suffered an injury in fact and this Court lacks jurisdiction to adjudicate Plaintiffs' claims.  [*Id.* at 6-10]

"To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (internal quotations omitted). "[T]he injury must affect the plaintiff in a personal and individual way." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 134 (2011) (quotation omitted). "In essence, standing requires that the 'plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal court jurisdiction and to justify [the] exercise of the court's remedial powers on his behalf.'" *Michael W. v. United Behavioral Health*, 420 F. Supp. 3d 1207, 1221 (D. Utah 2019) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976)). "[N]amed Plaintiffs who represent a class must allege and show that they have personally been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (quotation omitted); *Rector v. City & Cnty. of Denver*, 348 F.3d 935, 946 (10th Cir. 2003) (dismissing class action because class representatives had not suffered injury).

Defendants argue that Plaintiffs have only alleged future, speculative damages to their PEX piping and their homes, and that speculative future injuries do not satisfy Article III standing requirements. [#33 at 9 (citing *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1155 (10th Cir. 2005)] The Court disagrees. As Plaintiffs point out, the Complaint "refers collectively to the Matzdorf and Hoyord class representative Plaintiffs as 'Plaintiffs,'" and makes a number of affirmative statements regarding damages

"Plaintiffs"—*i.e.* the Matzdorfs and Hoyords—have experienced.   [#35 at 2]   For example, the Complaint states:

- "The Uponor PEX in Plaintiffs' Homes is prematurely degrading, deteriorating and/or failing and suffers from micro-cracking." [#31 at ¶ 11]

- "UPONOR PEX has caused *damage to, and failure of, plumbing systems*, which has caused and will continue to cause *Plaintiffs* and the Class to incur damages." [*Id*. at ¶ 31 (emphasis added)]

- Plaintiffs have incurred "damages to other property." [*Id*. at 87]

- Listing damage as including "damage to their homes, businesses and personal property due to *leakage*."   [*Id*. at 88 (emphasis added)]

- "[Plaintiffs' injuries include] the amount of out-of-pocket losses from damage to Plaintiffs' . . . homes and other structures, businesses and personal property from the *cost of replacement tubing and fittings, water leaks, the cost to repair any leaks, and/or the cost to repair or replace damaged personal and/or real property* associated with the defective UPONOR PEX." [*Id*. at ¶ 97 (emphasis added)]

- Plaintiffs "need to remove and replace the UPONOR PEX plumbing systems in their homes." [*Id*. at ¶ 96]

The Court finds these allegations sufficient to establish Article III standing, and it particularly finds that Plaintiffs have alleged that: (1) their PEX pipes are themselves damaged and (2) their homes or other property have experienced damage.

The cases cited by Defendant are distinguishable because the plaintiffs in those cases did not allege any damage either to the products at issue or their personal

11

property.   For example, in *Mariani v. Titeflex Corporation*, the plaintiff brought class claims for strict liability, negligence design defect, and failure to warn due to the defendants' allegedly defective corrugated stainless steel tubing, which plaintiff alleged had thin walls that could easily be perforated by lightning strikes and, under some circumstances, cause a fire.   No. 13-cv-01720-MSK-BNB, 2014 WL 3402514, at *2-3 (D. Colo. July 10, 2014).   Unlike here, where Plaintiffs have alleged that there is *actual damage* to their PEX pipes and homes, the *Mariani* plaintiff did not allege any damage to her home or the pipes and instead only alleged damage would occur *if and when* lightning struck her home.   *Id.* at *4.   Moreover,  unlike in *Penrod v. K&N Eng'g, Inc.*, Plaintiff does not allege that the PEX is "merely at risk of failing" but that it is already suffering from deterioration and leakage.   14 F.4th 671, 673 (8th Cir. 2021).   Nor is *Harrison v. Leviton Mfg. Co.* on point:   There, the Plaintiff alleged that the electric receptacle in his home created a risk of electrical fires, but did not allege that the receptacle in his home had failed or malfunctioned in any way.   2006 WL 2990524, at *1-3 (N.D. Okla. Oct. 19, 2006) ("The alleged need to replace the push-in receptacles in his home has not arisen because plaintiff has not actually discovered any damage to the wiring in his home [and plaintiff] merely seeks to prevent any damage from occurring."). [2]

---

[2] Defendants also cite to *Rule v. Fort Dodge Animal Health, Inc.*, 607 F.3d 250, 251-55 (1st Cir. 2010), *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 320 (5th Cir. 2002), *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 636 (3d Cir. 1996), and *Birdsong v. Apple, Inc.*, 590 F.3d 955, 956, 961 (9th Cir. 2009). In each of these cases the court determined that the plaintiffs had not alleged an actual injury, whereas, here, this Court determines that Plaintiffs have sufficiently alleged both that the pipes in their homes are experiencing damage and that this damage has caused additional damage to their homes and property.

Defendants fault Plaintiffs for an alleged "subjective[] belie[f]" "without support" that their PEX is damaged.  [#33 at 9]  And they state that the Complaint is:

> glaringly devoid of any data, statistics, investigative results, or other actual facts/details lending any credence to this professed hypothesis, much less establishing that Plaintiffs themselves have experienced and/or actually discovered microcracks or other indicia of premature degradation in the PEX piping purportedly installed in their own homes.  For example, there is no allegation that Plaintiffs removed, analyzed, and discovered microcracking in any of the PEX installed in their homes—instead, it appears the PEX in their homes continues to function exactly as intended (that is, the PEX is moving potable water through Plaintiffs' homes without issue).

[*Id*. at 8 (citation omitted)]  But "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quotation omitted, alteration in original); *see also Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (stating that at the pleading stage, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  (quoting *Twombly*, 550 U.S. at 555)).

Here, Plaintiffs have alleged that their PEX pipes are suffering from damage and that their homes and property have incurred damage as a result.  How they determined such damage exists and the degree of damage are not issues required to be addressed at the pleadings stage, and Plaintiffs allegations of the injury themselves are sufficient to establish standing at this juncture.  *Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("For purposes of ruling on a motion to dismiss for want of standing, [the trial court] must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.").  Accordingly, this Court RECOMMENDS

Defendants' Motion be DENIED as to standing. *See Hull v. Viega, Inc.*, No. 12-2086-JAR-TJJ, 2014 WL 896621, at *6 (D. Kan. Mar. 6, 2014) ("Here, the Complaint alleges that Plaintiffs . . . have been injured because they own homes that contain allegedly defective plumbing fixtures manufactured by Defendants . . . that will leave [the pipes] susceptible to dezincification when exposed to water, which in turn, has or is reasonably certain to lead to corrosion, plumbing blockages, and other damage. Thus, accepting Plaintiffs' allegations as true, they have sufficiently alleged a present or future injury resulting from the allegedly defective yellow brass fittings.").

### B. Arbitration Agreement

Having found that Plaintiffs have standing to proceed with their claims, the Court next turns to Defendants' arguments that Plaintiffs should be compelled to arbitration due to an arbitration agreement in the "Uponor, Inc. Limited Warranty" (the "Warranty"). [#33 at 11-16]  As a threshold matter, the Court must determine whether an agreement to arbitrate exists. *Avedone Eng'g*, 126 F.3d at 1287.  Here, because the parties dispute whether there is a valid and enforceable arbitration agreement, the presumption of arbitrability falls away. *Nesbitt I*, 74 F. Supp. 3d at 1370; *Dumais*, 299 F.3d at 1220. "A federal court must apply state contract law principles when determining whether an arbitration agreement is valid and enforceable." *Nesbitt I*, 74 F. Supp. 3d at 1371 (citing *First Options of Chicago*, 514 U.S. at 944); *N.A. Rugby Union LLC v. U.S. Rugby Football Union*, 442 P.3d 859, 863 (Colo. 2019) (providing that arbitration is a matter of contract and subject to principles of contract interpretation).  A federal court sitting in diversity applies the conflict of law rules of the forum state. *See Klaxon Co. v. Stentor*

*Elec. Mfg.*, 313 U.S. 487, 497 (1941).  The parties agree that this Court should apply Colorado contract law.  [*See* ## 33 at 12; 35 at 10]

Defendants argue that Plaintiffs are third-party beneficiaries of the Warranty, which contains an arbitration clause.[3]  [#33 at 11-13]  "It is well-settled that 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'"  *N.A. Rugby Union*, 442 P.3d at 863 (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).  Nonetheless, Colorado courts have recognized certain exceptions to this general rule, including where a party is a third party beneficiary of a contract.  *Id.* at 863-64.  Under Colorado law, a third-party beneficiary to a contract is an individual who, despite not being a signatory to the contract, is "'intended by the other parties to be a direct beneficiary of that agreement.'"  *Otimo Music, Inc. v. Royalty Exch., Inc.*, No. 18-CV-00006-RBJ, 2018 WL 6697073, at *3 (D. Colo. Dec. 20, 2018) (citing *Villa Sierra Condo. Ass'n v. Field Corp.*, 878 P.2d 161, 166 (Colo. App. 1994)).  "'That intent may be evidenced either from the terms of the agreement, the surrounding circumstances, or both.'"  *Id*.  The benefit to the third-party must be "direct and not merely an incidental benefit of the contract."  *Jefferson Cnty. Sch. Dist.*, 826 P.2d at 843 (citing *E.B. Roberts Construction Co. v. Concrete Contractors, Inc.*, 704 P.2d 859, 865 (Colo.1985)).

However, Plaintiffs argue that there is no evidence that *any* contract was made with any person; accordingly, they cannot be beneficiaries of a contract that does not

---

[3] The parties appear to agree that Plaintiffs themselves did not sign any arbitration agreement, nor did they sign any acknowledgement of the Warranty containing the arbitration language.  [##33 at 11-13; 35-1 (declaration of Joel Matzdorf); 35-2 (declaration of Mikayla Matzdorf); 35-3 (declaration of Duangdow Hoyord); 35-4 (declaration of Luke T. Hoyord)]

exist.  [#35 at 11]   The Court agrees that Defendants have not produced evidence that a contract was formed with any person or entity, thus creating an issue of fact as to whether Plaintiffs could be third-party beneficiaries.  Under Colorado law, a contract is formed "when one party makes an offer and the other party accepts it, and the agreement is supported by consideration." *Sumerel v. Goodyear Tire & Rubber Co.*, 232 P.3d 128, 133 (Colo. App. 2009).  "For a contract to arise, both parties must mutually assent to all essential elements of the agreement."  *Grosvenor v. Qwest Corp.*, 854 F. Supp. 2d 1021, 1024 (D. Colo. 2012) (citing *Federal Lumber Co. v. Wheeler*, 643 P.2d 31, 36 (Colo.1981)).  Contract formation in the sale of goods turns on objective manifestations of assent, not the secret or purely subjective intentions of one party. *Grosvenor*, 854 F. Supp. 2d at 1026; *Nat'l Envtl. Serv. Co. v. Ronan Eng'g Co.*, 256 F.3d 995, 1002 (10th Cir. 2001) (explaining that the UCC relies "on objective, observable manifestations of intent to contract," not the purely subjective intent of the parties).

Here, as evidence of an arbitration agreement, Defendants have provided a single declaration from an Uponor employee, who had no direct connection to the installation of PEX in Plaintiffs' homes.  [#33-1]  That declaration establishes only the following:  (1) that PEX sold in the Unites States after October 15, 2012 is "subject to"[4] the Warranty; (2) that at the time Plaintiffs' homes were built, Uponor "continuously published" the Warranty on the Uponor website; (3) that Uponor intended its Warranty to apply to persons who acquire homes from builders; (4) that Uponor trains its plumbers "so that they are qualified and able to respond to and provide service as well

---

[4]  The Court notes that the assertion that all PEX is "subject to" the Warranty is conclusory in nature.

as advice addressing any needs that individual homeowners may have with respect to PEX installed in their homes . . . [including] the fact that Uponor's PEX is subject to and covered by a written Uponor warranty"; and (5) it is "common" for plumbers to "advise homeowners that they may submit a claim pursuant to Uponor's Warranty."  [#33-1 at ¶¶ 6-10]

Defendants do not provide evidence demonstrating that any individual or entity associated with Plaintiffs' homes was aware of the Warranty.  Indeed, although Defendants argue (notably without citation to evidence) that "Uponor on the one hand and Oakwood/SA Homes on the other, clearly understood and intended for the Warranty to transfer and inure to the benefit of Plaintiffs, as the end purchasers of the homes following their construction" [#33 at 14], Defendants provide no evidence that Oakwood and SA Homes were even aware of the Warranty, much less that they "clearly understood and intended" that it would benefit Plaintiffs.  It is, for example, not obvious to the Court that Defendants made purchasers of their PEX aware of the Warranty upon purchase, nor that they incorporated the digital version of the warranty into any purchasing agreement.  *See Am. Family Mut. Ins. Co. v. TAMKO Bldg. Prods.*, 178 F. Supp. 3d 1121, 1126 (D. Colo. April 13, 2016) (finding arbitration agreement existed because warranty containing arbitration term was affixed to the product wrapping and plaintiffs' agent bound plaintiffs to the agreement by opening the package and using the product); *Vernon v. Qwest Comm. Intern., Inc.*, 925 F. Supp. 2d 1185, 1191 (D. Colo. 2013) (finding agreement to arbitrate existed where customers were informed that

enrolling in program constituted an agreement to be bound to terms, including an arbitration agreement, which were separately located on Defendant's website).[5]

Indeed, all the Court can discern from the evidence presented is that Uponor employees, generally speaking, are aware of the Warranty and that it is available in some capacity on Uponor's website. *French v. Centura Health Corp.*, 509 P.3d 443, 449-50 (Colo. 2022) (stating that "[t]he requisite meeting of the minds is established by the parties' acts, conduct, and words," and that "[g]eneral or oblique references to a document to be incorporated"—such as terms on a website—"are usually insufficient to support a finding that the document was incorporated by reference"); *Walker v. BuildDirect.Com Techs.*, Inc., 349 P.3d 549, 554 (Okla. 2015) (concluding that a reference in a contract to the seller's "Terms of Sale" was insufficient to incorporate the terms of sale on the seller's website because it did not convey to the buyers that the seller was referring to anything other than the sales terms expressly enumerated within the four corners of the parties' contract) (*cited in French*, 509 P.3d 450); *Bacon v. Avis Budget Grp., Inc.*, 959 F.3d 590, 601 (3d. Cir. 2020) (stating that "a party cannot assent to something he does not know exists" regarding an arbitration agreement in "rental

---

[5] This is consistent with how courts across the country determine whether arbitration provisions in warranty agreements for goods are sufficient to bind a consumer to the agreement. *See, e.g.*, *HRL Land or Sea Yachts v. Travel Supreme, Inc.*, No. 1:07-cv-945, 2009 WL 125845, at *5-6 (W.D. Mich. Jan. 16, 2009) (finding arbitration agreement existed even though plaintiff was not made aware of the warranty until several months after purchase because she signed the warranty acknowledgement, thus showing mutuality); *Krusch v. TAMKO Bldg. Prod., Inc.*, 34 F. Supp. 3d 584, 590 (M.D.N.C. 2014) (finding Plaintiff had constructive notice of the warranty, which included an arbitration agreement, because the warranty was expressly incorporated by reference into the purchase transaction); *Guerriero v. Sony Elec. Inc.*, 21 CV 2618 (VB), 2022 WL 736428, at *3 (S.D.N.Y. Mar. 11, 2022) (finding mutual assent where arbitration term in warranty was mailed with product to plaintiff, was clear and conspicuous, and Plaintiff offered no evidence that he did not receive the warranty or that he utilized the arbitration opt-out option).

jackets" not provided to customers and not sufficiently incorporated into rental contract); *cf. Haynes v. Uponor, Inc.*, No. 21-cv-05480-PJH, 2022 WL 541180 (N.D.Cal. Feb. 23, 2022) (finding, under nearly identical facts, that "assent is not an issue here" because it was "undisputed that plaintiffs signed the Purchase Agreement" which assigned the manufacturer warranty to plaintiffs).[6]   Thus, Plaintiffs have identified "a lack of evidence"— namely, the absence of evidence of mutual assent and the formation of a contract—"on an essential element of the nonmovant's claim."   *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (describing summary judgment standard); *see also Grosvenor*, 854 F. Supp. 2d at 1026 ("When a party is unaware of a term of a contract because it was hidden or obscured, there can be no presumption that there was a meeting of the minds as to such term.").

This absence of evidence of an underlying contract is not remedied by Defendants' argument that Colorado Revised Statute § 4-2-318 binds Plaintiffs to the arbitration agreement.  [#33 at 13-14]  Section 318 provides that "[a] seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume, or be affected by the goods and who is injured by breach of the warranty."  Colo. Rev. Stat. § 4-2-318.  Defendants thus argue that because the Warranty extends by statute to all end users—regardless of privity of contract—Plaintiffs are "subject to and bound by any limitations prescribed by that warranty."  [#33 at 13]

---

[6] The *Haynes* court further determined that Plaintiffs had judicially admitted to being subject to the PEX warranty by bringing a claim for breach of the implied warranty. *Haynes*, 2022 WL 541180, at *3.  However, the *Haynes* court based this determination on California law, which, unlike Colorado law, requires privity of contract in an action for breach of implied warranty.  *Id.*; *cf.* Colo. Rev. Stat. § 4-2-318.

But such an argument ignores the central tenant of arbitration law—that arbitration is a matter of contract—and also ignores the purpose of Section 318, which is to "give certain beneficiaries the benefit of the same warranty which the buyer *received in the contract of sale*" without requiring privity of contract and to, likewise, impose any limitations in that contract of sale.  C.R.S. § 4-2-318, COMMENT 1 ("To the extent that the contract of sale contains provisions under which warranties are excluded or modified, or remedies for breach are limited, such provisions are equally operative against beneficiaries of warranties under this section."); *id*., COMMENT 2 ("The purpose of this section is to give certain beneficiaries the benefit of the same warranty which the buyer received in the contract of sale.").   Here, Defendant has failed to produce evidence that the Warranty was part of the contract of sale for the PEX in Plaintiffs' homes.  It is therefore not at all clear that—even under Defendants' interpretation of the statute—Plaintiffs can be bound by the terms in the Warranty.   *Wenner Petroleum Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 748 P.2d 356, 357 (Colo. App. 1987) (noting that section 4-2-318 "provides that *properly executed limitations* of warranties or available remedies are equally applicable to any one that would be a beneficiary of a seller's warranty" (emphasis added)); *cf. Platt v. Winnebago Indus., Inc.*, 960 F.3d 1264, 1274-75 (10th Cir. 2020) (upholding limitations in a warranty where Plaintiff "had an opportunity to read the warranty before signing," was "aware of the warranty," and the limitation at issue was not inconspicuous).[7]

---

[7] Defendants also argue that Plaintiffs have "judicially admitted" that they are "beneficiaries of the Warranty who are bound by its terms."  [#33 at 14]  But, as noted above, it is not clear to the Court that the limitations and arbitration agreement in the Warranty were properly executed, or indeed that they were shown to any individual other than Uponor employees.   Moreover, Plaintiffs have declared—and Defendant

20

Accordingly, because Plaintiffs have identified an issue of fact as to the existence of the underlying contract, this Court RECOMMENDS the Motion to Compel Arbitration be DENIED and that this matter proceed to summary trial on the issue of the existence of an arbitration agreement.  *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006) ("When parties dispute the making of an agreement to arbitrate, a jury trial on the existence of the agreement is warranted unless there are no genuine issues of material fact regarding the parties' agreement."); *Ragab v. Howard*, 841 F.3d 1134, 1139 (10th Cir. 2016) ("When there is a genuine dispute of material facts, district courts must 'proceed summarily to the trial' to resolve the factual disputes." (quoting 9 U.S.C. § 4).  Because the Court Recommends that this matter proceed to trial on the existence of an arbitration agreement, it does not address Defendants' argument regarding the scope of the arbitration agreement, nor their arguments that Plaintiffs have failed to state certain claims and class allegations.   [*See generally* #33]    Thus, it RECOMMENDS that these portions of the Motion be DENIED WITHOUT PREJUDICE.

## IV.   CONCLUSION

For the foregoing reasons, this Court respectfully **RECOMMENDS** that:

(1) Defendants' Motion to Dismiss for lack of standing be **DENIED**;

(2) Defendants' Motion to Compel Arbitration be **DENIED**;

---

does not appear to dispute—that they were not aware of the Warranty.  [##33 at 11-13; 35-1 (declaration of Joel Matzdorf); 35-2 (declaration of Mikayla Matzdorf); 35-3 (declaration of Duangdow Hoyord); 35-4 (declaration of Luke T. Hoyord)]   And Plaintiffs "judicial admission," as outlined by Defendants, is that they "would reasonably be expected to use [Uponor PEX] in the plumbing systems in their homes."  [#33 at 15 (citing #31 at ¶¶ 54-56)]   While such a statement certainly implies that Plaintiffs are subject to Section 318, it does not remedy the lack of evidence of any valid contract or properly executed warranty limitations.

(3) This matter proceed to trial on the issue of the existence of an arbitration agreement; and,

(4) Defendants' Motion to Dismiss as it relates to the statement of claims and class allegations be **DENIED WITHOUT PREJUDICE**, with leave to refile if a trial establishes that no arbitration agreement was formed.[8]

DATED:  August 24, 2022

BY THE COURT:

s/Scott T. Varholak
United States Magistrate Judge

---

[8] Within fourteen days after service of a copy of this Recommendation, any party may serve and file written objections to the magistrate judge's proposed findings of fact, legal conclusions, and recommendations with the Clerk of the United States District Court for the District of Colorado.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Griego v. Padilla (In re Griego)*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review."  *United States v. 2121 East 30th Street*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings of fact, legal conclusions, and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings of fact, legal conclusions, and recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (holding that the district court's decision to review magistrate judge's recommendation *de novo* despite lack of an objection does not preclude application of "firm waiver rule"); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refining Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (finding that cross-claimant waived right to appeal certain portions of magistrate judge's order by failing to object to those portions); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (finding that plaintiffs waived their right to appeal the magistrate judge's ruling by failing to file objections).  *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (holding that firm waiver rule does not apply when the interests of justice require review).